STATE of Utah, Plaintiff and Appellee,

v.

Clinton PERANK, Defendant and Appellant.

No. 860243.

Supreme Court of Utah.

July 17, 1992.

Remittitur Stayed Aug. 4, 1993.

---

David L. Wilkinson, Earl F. Dorius, Michael M. Quealy, Dallin W. Jensen, Salt Lake City, for State of Utah

Kirk C. Bennett, West Valley, for Perank.

Alvin G. Nash, Vernal, Herbert W. Gillespie, Duchesne, Tom D. Tobin, Alvin Pahlke, Susan W. Pahlke, Winner, South Dakota, for amici Duchesne County and Uintah County.

Stephen G. Boyden, Salt Lake, for amicus Ute Indian Tribe.

STEWART, Justice:

Clinton Perank was convicted in a state court of committing a burglary in Myton, Utah, in violation of Utah Code Ann. § 76-6-202 (1978), and placed on probation. The court thereafter revoked his probation and ordered him committed to the Utah State Prison for a term of 0-5 years. Perank appealed from the revocation of probation, and we stayed execution of the sentence pending appeal.[1]

Perank argues that the state trial court lacked jurisdiction to convict him of burglary and that the Ute Tribal Court had exclusive jurisdiction because he is an Indian and the offense occurred within Indian country. Two issues are presented: (1) whether Perank is an Indian and (2) whether the Uintah–Ouray Indian Reservation was diminished by an act of Congress, leaving Myton, Utah, outside the jurisdictional boundaries of that Reservation.

 Even though Perank pleaded guilty to the burglary charge and did not raise the issue of lack of subject matter jurisdiction with respect to the burglary until the probation revocation proceeding, the issue is properly before this Court. A plea of guilty does not waive a claim that the court lacks power to adjudicate a charge against the defendant. *Blackledge v. Perry*, 417 U.S. 21, 30–31, 94 S.Ct. 2098, 2103–04, 40 L.Ed.2d 628 (1974); *see also* 1 Charles A. Wright, *Federal Practice and Procedure* § 175, at 623–33 (1982). Also, the issue of subject matter jurisdiction can be raised at any time. *See Glasmann v. Second District Court*, 80 Utah 1, 7, 12 P.2d 361, 363 (1932).

This Court invited the United States Department of Justice to file an amicus curiae brief in this case because of the importance of the issue of the location of the boundaries of the Uintah–Ouray Indian Reservation (sometimes hereinafter "Uintah Reser-

---

**1.** Appellate jurisdiction of this case would ordinarily lie with the Utah Court of Appeals. *See* Utah Code Ann. § 78-2a-3(2)(f) (Supp.1988).

Because of the importance of the question presented, the Court of Appeals certified the case to this Court.

vation") and because the Department had filed an amicus brief in opposition to the State of Utah's petition for certiorari to the United States Supreme Court from a decision of the United States Court of Appeals for the Tenth Circuit which held that the Uintah Reservation had not been diminished under a series of congressional acts from 1902 to 1905. *See Ute Indian Tribe v. Utah,* 773 F.2d 1087 (10th Cir.1985) (en banc), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The Department of Justice submitted to this Court a copy of the amicus brief it filed for the United States opposing the State's petition for certiorari in *Ute Indian Tribe.* In that brief, the Department stated, inter alia, that the issues presented in the petition for a writ of certiorari did not require review by the Supreme Court at that time because

they could be addressed in a later case if the Utah Supreme Court were to disagree with the Tenth Circuit.[2]

■ The Ute Indian Tribe, also at our invitation, filed an amicus brief, but addressed only the issue of whether Perank is an Indian within the meaning of 18 U.S.C. § 1152. We note that neither Perank, the Department of Justice, nor the Tribe suggests that the Tenth Circuit's en banc decision in *Ute Indian Tribe* has res judicata effect in this case.[3]

## I. PERANK'S INDIAN STATUS

■ State criminal jurisdiction does not extend to Indians who commit crimes in Indian country. *See* 18 U.S.C. §§ 1152,

---

**2.** The Department of Justice in its amicus brief failed to recognize that the Tenth Circuit's *en banc* decision in *Ute Indian Tribe* was in conflict with prior decisions of this Court. *See Sowards v. Meagher,* 37 Utah 212, 108 P. 1112 (1910); *White Rocks Irrigation Co. v. Mooseman,* 45 Utah 79, 141 P. 459 (1914). The Department referred only to *Brough v. Appawora,* 553 P.2d 934 (Utah 1976), which was vacated and remanded for further consideration. *Brough v. Appawora,* 431 U.S. 901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977). No further opinion was rendered by this Court in *Brough.* The Department's brief stated, "If the Utah Supreme Court nevertheless should adhere to its prior view in some future case, notwithstanding the intervening decision in *Solem* and the exhaustive consideration of the issue by the courts below, there will be time enough for this Court to grant review." Brief for the United States in opposition as Amicus Curiae, *Utah v. Ute Indian Tribe,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596, on petition for writ of certiorari to United States Court of Appeals for the Tenth Circuit, No. 85–1821, October Term 1986, at 14–15.

**3.** Res judicata is an affirmative defense in both criminal and civil cases and therefore is waivable. *See* Utah R.Civ.P. 8(c), 12(h); *Rothey v. Walker Bank & Trust Co.,* 754 P.2d 1222, 1225 (Utah 1988); *Manger v. Davis,* 619 P.2d 687, 692 (Utah 1980); *Jackson v. Rich,* 28 Utah 2d 134, 499 P.2d 279, 280 (1972); *Williams v. Oklahoma,* 358 U.S. 576, 585, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959); *Louisville and Nashville R.R. v. M/V Bayou Lacombe,* 597 F.2d 469, 471 n. 1 (5th Cir.1979); *Parks v. Pavkovic,* 753 F.2d 1397, 1404 (7th Cir.1985); *State v. Hall,* 86 Idaho 63, 383 P.2d 602, 611–12 (1963). Even if the defense had been raised in this case, its applica-

tion against the State of Utah would be problematic. Although we have held that collateral estoppel does not require mutuality of parties when used defensively against private litigants, *see Robertson v. Campbell,* 674 P.2d 1226, 1230 (Utah 1983); *Searle Brothers v. Searle,* 588 P.2d 689, 690–91 (Utah 1978), we have not decided whether the doctrine of nonmutual collateral estoppel applies against the State. Federal law generally requires full mutuality of parties when collateral estoppel is applied against the government. *See United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *see also United States v. Stauffer Chemical Co.,* 464 U.S. 165, 169, 104 S.Ct. 575, 577, 78 L.Ed.2d 388 (1984); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Montana v. United States,* 440 U.S. 147, 155–62, 99 S.Ct. 970, 974–78, 59 L.Ed.2d 210 (1979); *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). Nonmutual collateral estoppel does not apply against the government because of overriding policy considerations. *Mendoza,* 464 U.S. at 163–64, 104 S.Ct. at 574. The rule requiring full mutuality of parties has also been required with respect to estopping state governments. *See Hercules Carriers, Inc. v. Florida,* 768 F.2d 1558, 1577–82 (11th Cir.1985). *See generally* Restatement (Second) of Judgments § 28 (1982); 18 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4425 (1981 & Supp.1992). As the Utah cases cited in footnote 2 indicate, the issue of reservation diminishment can arise in a number of civil contexts in which the State of Utah is not a party, and rather than delay a decision on an issue of such substantial public importance that will inevitably recur, we think it appropriate to address the diminishment question, even if res judicata were otherwise applicable against the State.

1153 (1982 & Supp.1991).[4] Federal statutes, however, do not define the term "Indian" for jurisdictional purposes. Although the State concedes that Perank is an Indian, the Tribe, as amicus, argues that he is not. Ordinarily, an amicus may only present arguments pertaining to issues properly raised by the parties before the court. However, because this issue goes to subject matter jurisdiction, we will address it.

The Tribe argues that Perank is not an Indian under the jurisdictional statute because he was not officially enrolled as a member of the Tribe at the time of the burglary. We disagree and hold that Perank was an Indian at the time of the crime for purposes of 18 U.S.C. §§ 1152, 1153.[5]

■ *United States v. Rogers*, 45 U.S. (4 How.) 567, 572–73, 11 L.Ed. 1105 (1846), set forth two factors to be evaluated in determining who is an Indian. A person is an Indian who (1) has a significant degree of Indian blood and (2) is recognized as an Indian by a tribe or society of Indians or by the federal government. *See United States v. Dodge*, 538 F.2d 770, 786 (8th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *St. Cloud v. United States*, 702 F.Supp. 1456, 1460 (D.S.D.1988); *State v. LaPier*, 242 Mont. 335, 790 P.2d 983, 986 (1990); *State v. Attebery*, 110 Ariz. 354, 519 P.2d 53, 54 (1974); *see also Ex parte Pero*, 99 F.2d 28, 30–32 (7th Cir.1938), *cert. denied*, 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939); Robert N. Clinton, *Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze*, 18 Ariz.L.Rev. 503, 515–16 (1976).[6]

4. A complex set of rules governs criminal jurisdiction in Indian country. *See generally* Felix S. Cohen, *Handbook of Federal Indian Law* 34–38, 286–304, 335–41 (1982); Robert N. Clinton, *Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze*, 18 Ariz. L.Rev. 503 (1976); Scott W. Wilson, *Criminal Jurisdiction in Montana Indian Country*, 47 Mont.L.Rev. 513 (1986); Paul S. Volk, Note, *The Legal Trail of Tears: Supreme Court Removal of Tribal Court Jurisdiction Over Crimes By and Against Reservation Indians*, 20 New Eng.L.Rev. 247 (1984–85); K. Bliss Adams, Note, *Order in the Courts: Resolution of Tribal/State Criminal Jurisdictional Disputes*, 24 Tulsa L.J. 89 (1988).

5. Section 1152 of the United States Code provides:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

Section 1153 of the Code provides:

Any Indian who commits against the person or property of another Indian or another person any of the following offenses, namely, murder, manslaughter, kidnapping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

As used in this section, the offenses of burglary and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

In addition to the offenses of burglary and incest, any other of the above offenses which are not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

6. While federal criminal statutes do not define the term "Indian," 25 U.S.C. § 479 (1983) defines Indian for the purposes of land ownership and allotment:

The term "Indian" as used in [various sections of Subchapter V—Protection of Indians and Conservation of Resources] shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of said sections, Eskimos and other aboriginal peoples of Alaska shall be considered Indians.

■ We turn to the first factor, whether Perank has a significant degree of Indian blood. As the son of a full-blood Ute father and a mixed-blood mother, Perank has more than one-half Indian blood and at least one-half Ute blood, which is sufficient to satisfy the first requirement under *Rogers*. Persons with less than one-half Indian blood have been held to have a significant degree of Indian blood. *See, e.g., St. Cloud*, 702 F.Supp. at 1460–61 (holding 15/32 Yankton Sioux blood sufficient to establish the first *Rogers* requirement and citing four cases which held less than 1/2 Indian blood to be sufficient); *Makah Indian Tribe v. Clallam County*, 73 Wash.2d 677, 440 P.2d 442, 444 (1968) (1/4 Indian blood sufficient).

■ Perank has also been recognized as an Indian by both the Tribe and the federal government. Although Perank was not formally enrolled in the Ute Tribe at the time of his conviction, lack of enrollment does not determine Indian status for purposes of jurisdiction. *See Ex parte Pero*, 99 F.2d at 31; *St. Cloud*, 702 F.Supp. at 1461; *LaPier*, 790 P.2d at 987. Nevertheless, the Tribe formally recognized Perank as an Indian and as a member of the Tribe by his enrollment in the Tribe at a later date. Moreover, under the terms of the Ute Indian Tribe Constitution, it appears that Perank was a member of the Ute Tribe at the time of the offense. Article II, section 1(b) of the Constitution provided that a child born to a member of the Tribe living on the Reservation at the time of the birth is entitled to membership. That provision states:

Section 1. The membership of the Ute Indian Tribe of the Uintah and Ouray Reservation shall consist as follows:

. . . .

(b) All children born to any member of the Ute Indian Tribe of the Uintah and

Ouray Reservation who is a resident of the Reservation at the time of the birth of said children.

Ute Indian Tribe of the Uintah and Ouray Reservation Const. art. II, § 1.[7] Perank's father was an enrolled member of the Tribe and resided on the Reservation when Perank was born.[8] In *Chapoose v. Uintah And Ouray Tribal Business Committee*, Civ. No. 133–77, slip op. at 16–19 (Ute Tribal App.Ct. Jan. 22, 1981), the Ute Tribal Appellate Court held that Tribe membership was an automatic right for those who qualified under article II, section 1 of the Ute Constitution. Enrollment merely formalized the right.

In addition, according to an affidavit filed by Perank in the trial court, he has lived as an Indian by maintaining social, political, and spiritual relations as an Indian, including participation in Indian rituals. In his brief, he states that he "has lived his life as an Indian, and has been treated as an Indian by governmental entities." Also, in January 1986, Perank was convicted of three offenses in the Ute Tribal Court.

On these facts, we conclude that Perank carried his burden of factually establishing that he has been "recognized racially" as a Ute Indian. Accordingly, we hold that Perank is an Indian for the purpose of determining jurisdiction under 18 U.S.C. §§ 1152 and 1153.

## II. THE BOUNDARIES OF THE UINTAH–OURAY RESERVATION

The next issue is whether Myton, Utah, the site of the burglary, lies within Indian country, i.e., within the boundaries of the Uintah–Ouray Reservation. If so, the district court lacked jurisdiction over the

---

Perank would be considered an Indian under this provision because he has one-half or more Indian blood. The definition of the term "Indian" may vary, however, depending on the context for which Indian identity is relevant. *See* Felix S. Cohen, *Handbook of Federal Indian Law* 19–20 (1982).

7. We take judicial notice of the Tribal Constitution pursuant to Rule 201(b) of the Utah Rules of Evidence. This provision of the Constitution was amended in 1988.

8. These facts are taken from affidavits of Perank's parents submitted in the revocation proceeding.

crime under 18 U.S.C. § 1152.[9] There are two contentions: first, that Myton is not within the Uintah–Ouray Reservation because the Reservation was diminished by a 1902 congressional Act as amended and supplemented by subsequent Indian Appropriation Acts in 1903, 1904, and 1905, and second, that the 1905 Act opened the Reservation without regard to the 1902 Act and that the language of the 1905 Act left the boundaries of the Reservation intact.

Resolution of the diminishment issue turns on two issues. The first is whether the language of the Act of May 27, 1902, which provided that the unallotted lands were to be "restored to public domain," if used as operative statutory language opening a reservation would effect a diminishment of that reservation as to the lands so restored. The second issue is whether, as a matter of statutory construction, the operative language in the 1902 Act, "restored to the public domain," remained in effect as operative statutory language when the Reservation was finally opened in 1905.

We hold that the restoration language in the 1902 Act established the necessary congressional intent to diminish the Reservation as to those lands restored to the public domain and that the restoration language in the 1902 Act remained operative statutory language when the Reservation was opened in 1905.

For clarity, we observe that all parties agree that the Uintah Reservation, as a political entity, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use. These lands are collectively referred to as "trust lands." Furthermore, it is an undisputed fact that approximately 1,010,000 Reservation acres were withdrawn and attached to what are now the Ashley and Uintah National Forests by presidential proclamation, pursuant to the 1905 Act. The legal status of these lands is not at issue here, nor is the legal status of the Uncompahgre Reservation, a neighboring reservation in eastern Utah. In 1948, Congress added to the Reservation 510,000 acres known as the Hill Creek Extension. Act of March 11, 1948, 62 Stat. 72. The status of that land is likewise not at issue. We note that the *en banc* decision in *Ute Indian Tribe* held that the land added to the Uintah National Forest remained in the Reservation and that the Uncompahgre Reservation was not disestablished. 773 F.2d at 1089–90; *id.* at 1099–1101 (Seymour, J., concurring). The only issue in this case, therefore, is whether the unallotted and unreserved lands that were opened to entry in 1905 and not later restored to tribal ownership and jurisdiction by the 1945 "Order of Restoration" are within the present boundaries of the Reservation.[10]

---

**9.** 18 U.S.C. § 1152 precludes the exercise of state jurisdiction over crimes committed by Indians in Indian country, and section 1151 defines Indian country to include all land within a reservation. *See supra* note 5.

**10.** In 1902, the Uintah Reservation contained approximately 2,039,040 acres. The federal government in 1905 withdrew 1,010,000 acres as an addition to the Uintah National Forest. The allotments to individual Indians under the 1902 Act and the lands reserved for grazing and other purposes set aside for the Tribe by a 1902 Joint Resolution and the 1903 and 1905 Acts make up approximately 360,000 acres. An executive "Order of Restoration" under the authority of the Act of June 18, 1934, 48 Stat. 984, restored to the Tribe in 1945 both the title and tribal jurisdiction to over 217,000 acres that had been previously opened and restored to the public domain in 1905. This Order is discussed later in the text. In 1948, Congress added to the Uintah Reservation the Hill Creek Extension, which contained approximately 510,000 acres of

the former Uncompahgre Reservation. At present, the Uintah Reservation, including the trust lands, the lands restored to tribal jurisdiction by the Order of Restoration, and the lands added to the Reservation by the Hill Creek Extension, total approximately 1,087,000 acres. If the 1,010,000 acres of Reservation land that were set apart as an addition to the Uintah Forest Reserve but held to be part of the Reservation in *Ute Indian Tribe* are added to the 1,087,000 acres, the Reservation today is larger than it was in 1902, before the restoration of the unallotted lands to the public domain.

There are approximately 1,500 enrolled members of the Ute Tribe. *Ute Indian Tribe*, 773 F.2d at 1105 (Seth, J., dissenting). The tribal seat of government is located at Fort Duchesne, Utah, which is located on trust lands. Most of the lands opened for settlement under the 1905 Act were in Duchesne County. Some 18,000 non-Indians now live in the area that the State asserts was disestablished, and only about 300 Indians, not all of whom are members of the

## A. *Congressional Intent to Diminish*

In 1887, Congress initiated a significant change in policy toward the Indians. The new policy was designed to integrate the Indians into white, agrarian society and ultimately to do away with the reservation system. The General Allotment Act of 1887, ch. 119, 24 Stat. 388, authorized the President to allot parcels of reservation lands to Indians and, with tribal consent, to sell the unallotted, or surplus, reservation lands to non-Indians. Thereafter, Congress from time to time enacted special legislation to ensure that a particular reservation was in fact opened to allotment. *Mattz v. Arnett*, 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973).

Questions subsequently arose regarding whether Congress in opening an Indian reservation, or a portion of it, to entry and settlement by non-Indians intended to leave the reservation boundaries intact so that the land opened to settlement remained within the boundaries of the reservation or whether the opening was also intended to diminish the reservation boundaries, thereby placing the opened land outside the reservation. In *Solem v. Bartlett*, 465 U.S. 463, 468, 104 S.Ct. 1161, 1164, 79 L.Ed.2d 443 (1984), the Court explained why Congress in enacting the surplus land acts around the turn of the century often did not make its intent with respect to diminishment explicit:

> Unfortunately, the surplus land Acts themselves seldom detail whether opened lands retained reservation status or were divested of all Indian interests. When the surplus land Acts were passed, the distinction seemed unimportant. The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century. Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians. Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries. *See* Act of June 25, 1948, ch. 645, § 1151, 62 Stat. 757 (codified at 18 U.S.C. § 1151 (1982 ed.) ...).

> Another reason why Congress did not concern itself with the effect of surplus land Acts on reservation boundaries was the turn-of-the-century assumption that Indian reservations were a thing of the past. Consistent with prevailing wisdom, Members of Congress voting on the surplus land Acts believed to a man that within a short time—within a generation at most—the Indian tribes would enter traditional American society and the reservation system would cease to exist. Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation.

▇▇ As a consequence, each surplus land act must be examined to determine whether Congress intended to reduce the reservation's boundaries because each act employed its own statutory language, "the product of a unique set of tribal negotiation and legislative compromise." *Solem*, 465 U.S. at 467, 104 S.Ct. at 1164. Accordingly, the effect of a given surplus land act depends on the language of the act and the circumstances underlying its passage. *Id.* at 469, 104 S.Ct. at 1165.

▇▇ The most probative evidence of whether Congress intended to diminish a reservation is the language used in the statutory scheme opening the reservation. *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166. In addition to the intent derived from the face of the act, the surrounding circumstances and the legislative history are to be examined in determining congressional intent. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 587, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977) (citing *Mattz v. Arnett*,

---

Ute Tribe, live in that same area. The two towns where the bulk of the non-Indian population reside, Roosevelt and Duchesne, are in the disputed area that the State contends is not subject to tribal jurisdiction. Myton is also in that area.

412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973)). Subsequent treatment of the opened lands by Congress, federal agencies, and local authorities, *Solem,* 465 U.S. at 471, 104 S.Ct. at 1166, and subsequent jurisdictional history of the opened lands, *Rosebud,* 430 U.S. at 603–05, 97 S.Ct. at 1371–73; *DeCoteau v. District County Court,* 420 U.S. 425, 442–44, 95 S.Ct. 1082, 1091–93, 43 L.Ed.2d 300 (1975), may also be useful in resolving the issue of congressional intent to diminish. Congress, however, must have clearly evinced an intent to change the boundaries before diminishment will be found. *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166. And although doubtful language should be construed in favor of the Indians and against diminishment, this rule of construction does not dictate a determination that reservation boundaries were not diminished when there is a clear intent to the contrary. *See Rosebud,* 430 U.S. at 587, 97 S.Ct. at 1363.

■■■■ A variety of operative statutory phrases have been held to effect diminishment. *See Rosebud,* 430 U.S. at 593–94, 97 S.Ct. at 1366–67 (Marshall, J., dissenting); [11] *Russ v. Wilkins,* 624 F.2d 914, 921–22 (9th Cir.1980); *United States v. Parkinson,* 525 F.2d 120, 122–24 (8th Cir.1975), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977). No specific talismanic statutory language is required to conclude that Congress intended to diminish a reservation. *See Solem,* 465 U.S. at 471, 104 S.Ct. at 1166, and it is not necessary that statutory language expressly sever tribal jurisdiction to effectuate a diminishment. *See Rosebud,* 430 U.S. at 586–605, 97 S.Ct. at 1363–1373; *see also Solem,* 465 U.S. at 469 n. 10, 104 S.Ct. at 1165 n. 10. Also, a congressional scheme to diminish need not provide for unconditional compensation or a fixed sum to be paid to the Indians for

land to be detached from the reservation. *Solem,* 465 U.S. at 471, 104 S.Ct. at 1166; *Rosebud,* 430 U.S. at 596 n. 18, 97 S.Ct. at 1368 n. 18. Nor must a scheme to diminish provide for Indian consent. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); *Solem,* 465 U.S. at 470 n. 11, 104 S.Ct. at 1166 n. 11; *Rosebud,* 430 U.S. at 587, 97 S.Ct. at 1363.

■■■ Statutory language that merely provides for allotments to be made to the Indians and "opens" the remaining reservation lands to settlement by non-Indians does not demonstrate a congressional intent to diminish the boundaries of a reservation. *Rosebud,* 430 U.S. at 586–87, 97 S.Ct. at 1363; *Mattz v. Arnett,* 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent of Washington State Penitentiary,* 368 U.S. 351, 355–58, 82 S.Ct. 424, 426–28, 7 L.Ed.2d 346 (1962).

Cession-type language has, however, been held in several cases to establish the requisite intent to diminish. In *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), the statute at issue ratified an agreement between the United States and the Sisseton and Wahpeton bands of Sioux Indians whereby the Indians agreed to " 'cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in' " the unallotted lands of the Reservation. The Court held that this language was precisely suited to termination of the Reservation boundaries. *Id.* at 445, 95 S.Ct. at 1093. Similarly, in *Rosebud,* the Court held that cession-type language in a 1904 Act pertaining to a part of the Sioux Reservation manifested a congressional intent to disestablish, even though the cession language was technically misused in that it implied a bilateral agreement and Congress

---

**11.** In his dissent in *Rosebud,* Justice Marshall cited four specific examples of clear language of express termination: (1) " 'the Smith River reservation is hereby discontinued' "; (2) " 'a portion of the Colville Indian Reservation . . . is hereby, vacated and restored to the public domain' "; (3) " 'the reservation lines at the said Ponca and Otoe and Missouria Indian Reservation . . . are hereby abolished' "; and (4) part of

the Great Sioux Reservation was " 'restored to the public domain.' " *Rosebud,* 430 U.S. at 618, 97 S.Ct. at 1379 (Marshall, J., dissenting). In addition, Justice Marshall noted that an Indian library compilation contained eleven additional examples of express termination language taken from statutes enacted between 1888–1913. *Id.* at 618 n. 3, 97 S.Ct. at 1379 n. 3.

had acted unilaterally in diminishing the Reservation. *Rosebud*, 430 U.S. at 587–88, 97 S.Ct. at 1363–64.

Statutory language that opens reservation lands to public entry and "restores" those lands to the "public domain" has also been recognized in a number of Supreme Court cases to effectuate a diminishment of reservation boundaries as to such lands. In *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346 (1962), the Court stated that an 1892 Act that "vacated and restored to the public domain" the north half of the Colville Indian Reservation diminished the boundaries as to that part of the Reservation.[12] By contrast, the 1906 Act directly at issue in *Seymour* merely opened the south half of the Reservation to public entry. Because the 1906 Act contained no language restoring the land to the public domain, there was no diminishment as to the south half. Thus, the premise of the opinion in *Seymour* was that restoration of reservation land to the public domain constitutes a diminishment.

In *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), the issue was whether the United States had to pay the Indians compensation for lands that had been added to the Sioux Reservation for Indian use by executive order and later detached from the Reservation and "restored to the public domain," by executive order. An implicit assumption of the opinion is that the land restored to the public domain was no longer subject to tribal jurisdiction and had been detached from the Reservation.

In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), the Court recognized in dicta that the Act of March 2, 1889, 25 Stat. 896, which "restored to the public domain" a portion of the lands of the Great Sioux Reservation, terminated the Reservation as to those lands. 430 U.S. at 589 & n. 5, 97 S.Ct. at 1364 & n. 5. Even Justice Mar-

shall, who argued in a dissent that the Act at issue in *Rosebud* lacked an express indication of congressional intent to diminish, recognized that the language of the Act of March 2, 1889, disestablished the Reservation. He stated, "The very Act that created the Rosebud Reservation provides yet another example [of language effecting a diminishment], for in that Act Congress expressly 'restored to the public domain' part of the Great Sioux Reservation. Act of Mar. 2, 1889, § 21, 25 Stat. 896." *Id.* at 618, 97 S.Ct. at 1379 (Marshall, J., dissenting).

In *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), the Court held that the Lake Traverse Reservation in South Dakota was diminished on the basis of cession-type language, but stated the issue to be whether the Reservation "was terminated and returned to the public domain by the Act of March 3, 1891, c.543, 26 Stat. 1035." In other words, land that was "returned to the public domain" was considered no longer subject to tribal jurisdiction. Indeed, the Court referred to the 1892 Act in *Seymour*, which, as noted above, disestablished the north half of the Colville Reservation by vacating and restoring it "to the public domain," and compared it with the 1906 Act in *Seymour* that merely "opened" the south half of the Reservation, but did not disestablish it, and concluded that the 1891 Act at issue was analogous to the 1892 Act in *Seymour*. 420 U.S. at 448–49, 95 S.Ct. at 1094–95.

The Supreme Court's latest discussion of "public domain" language is found in *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). The Court acknowledged that in the act at issue a reference to the opened areas as being in "the public domain" gave support to the argument for diminishment. The public domain language in *Solem* was located in an isolated section of the Act, was used only in a descriptive manner, and did not purport to restore any land to the public

12. Act of July 1, 1892, ch. 140, 27 Stat. 62, 63.

domain.[13] Because that phrase was not an operative provision of the Act, the Court concluded that it did not indicate congressional intent to diminish. *Solem*, 465 U.S. at 474–75, 104 S.Ct. at 1168.

We have encountered only one case that stands contrary to these Supreme Court decisions on the effect of restoration language. *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir.1985) (en banc), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986), held that neither the Uintah–Ouray Reservation nor the adjacent Umcompahgre Reservation had been disestablished or diminished. The majority addressed the effect of restoration language, however, only with respect to the Uncompaghre Reservation. The court, relying on a construction of *Solem* later rejected by a panel of the Tenth Circuit, concluded that "the phrase 'restore to the public domain' is not the same as a congressional state of mind to disestablish. In other words, it doesn't disturb the ownership of the land by the tribal group." 773 F.2d at 1092. In reaching this conclusion, the lead opinion wholly ignored the teachings of *Seymour, Sioux Tribe, Rosebud, DeCoteau*, and the authorities cited in Justice Marshall's dissent in *Rosebud*. With respect to the Uintah Reservation, *Ute Indian Tribe* held that the terms of the 1905 Act alone governed the status of that Reservation and that the 1905 Act, which had no restoration language, did not diminish the Reservation. 773 F.2d at 1089; *id.* at 1093 (Seymour, J., concurring). The court stated that the 1902 and intervening Acts did not reveal a "'baseline purpose of disestablishment' that carried through into the 1905 Act." 773 F.2d at 1089.

After the decision in *Ute Indian Tribe* was rendered, a panel of the Tenth Circuit in *Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1397–1404 (10th Cir.), *cert. denied*, 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990), revisited the issue of the legal meaning of the phrase "restore to the public domain" and held that when used as operative statutory language, the phrase extinguishes reservation boundaries as to that land restored to the public domain. We set out an extended portion of the court's analysis of the legal effect of restoration language, an analysis not undertaken in *Ute Indian Tribe:*

> [R]ecent Supreme Court cases assume in dicta that congressional restoration language extinguished boundaries. *Mattz v. Arnett*, 412 U.S. 481, 490, 93 S.Ct. 2245, 2250, 37 L.Ed.2d 92 (1973), cites language from the Indian Appropriations Act of July 27, 1868, ch. CCXLVIII, 15 Stat. 198, 223, (Congress restored Mendocino Reservation lands "to the public lands") as clear and sufficient language of extinguishment of reservation boundaries. Similarly, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 589 n. 5, 600, 97 S.Ct. 1361, 1364 n. 5, 1370, 51 L.Ed.2d 660 (1977), accepted restoration language in the Act of March 2, 1889, ch. 405, § 21, 25 Stat. 888, 896 (portion of the Great Sioux Reservation "restored to the public domain") as language demonstrating congressional intent to extinguish prior boundaries. Even Justice Marshall's dissent in *Rosebud* acknowledges that section twenty-one of the Act of March 2, 1889 expressly disestablished part of the Great Sioux Reservation by restoring it to the public domain. *Rosebud Sioux Tribe*, 430 U.S. at 618, 97 S.Ct. at 1379 (Marshall, J., dissenting).

---

**13.** The Act in question, the Cheyenne River Act, contained nine sections and spanned three and one-half pages in the statutes at large. Act of May 29, 1908, ch. 218, 35 Stat. 460–64. The operative language of the Act was found in the first sentence of the first section. 35 Stat. 460; *Solem*, 465 U.S. at 472–73, 104 S.Ct. at 1167. The reference to "public domain" was found in the second proviso of the ninth section, or the last sentence of the Act. It was couched in the context of the Indians' right to use timber on particular sections of the lands to be opened:

> *Provided*, That Indians residing upon their allotments in townships sixteen north of ranges twenty-five, twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty, and thirty-one east shall have the right to use timber in said townships, except on sections sixteen and thirty-six for domestic purposes only as long as the lands remain part of the public domain.

35 Stat. 464. Unlike the instant case, this reference to public domain was clearly not the operative language of the Act.

Furthermore, in *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), Justice White's majority opinion (holding that cession of Lake Traverse Indian Reservation lands disestablished the reservation boundaries) assumed that restoration language was the equivalent of extinguishment of reservation status for the lands affected. The Court stated: "That the lands ceded ... were *returned to the public domain, stripped of reservation status,* can hardly be questioned.... The sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the 'public domain.'" *DeCoteau,* 420 U.S. at 446, 95 S.Ct. at 1094 (emphasis added).

Other Supreme Court cases suggest that affected Indian Tribes understood EO [executive order] restoration language to be language cancelling former EOs. In *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), the Sioux sought compensation for the value of lands "restored to the public domain" but did not contest in that action, or any other of which we are aware, the fact that whatever Tribal interest had been created by additions to the Great Sioux Reservation under EOs of 1875 and 1876 had been terminated by the restoration language of the subsequent EOs of 1879 and 1884. (The Court itself viewed such language as the equivalent of "cancelling or revoking" an EO establishing a Reservation or adding thereto. *Sioux,* 316 U.S. at 330, 62 S.Ct. at 1101.) *See also Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 176, 67 S.Ct. 650, 653, 91 L.Ed. 823 (1947).

Evidence that lower courts have accepted the view that restoration language is synonymous with extinction of reservation status is found in *Russ v. Wilkins,* 410 F.Supp. 579 (N.D.Cal.1976). "On many occasions Congress has unilaterally terminated sections of reservations by restoring them to the public domain.... The Act of 1873 [pertaining to the Round Valley Reservation in California] specifically 'restored to the public lands' the 12,000 acres it severed from the Reservation." *Id.* at 581. The court found that a subsequent 1905 act failing to employ restoration language did not terminate the reservation in question.

In summary, federal court cases reveal that neither Congress, the courts, nor Indian tribes themselves have insisted that restoration language be accompanied by more explicit cancellation language. Rather, they have used or accepted simple, operative restoration language as language of reservation termination in many situations. We have found no case where operative restoration language was not accepted as language of termination.

*Yazzie,* 909 F.2d at 1402–04 (footnotes omitted). In *Yazzie,* the court criticized the conclusion in *Ute Indian Tribe* that the phrase "restore to the public domain" is not the same as a congressional state of mind to disestablish, and characterized it as "unexamined and unsupported." *Id.* at 1400. *Yazzie* clearly departs from the court's prior conclusion in *Ute Indian Tribe* as to the effect of restoration language. Indeed, *Yazzie* held that the use of operative restoration language diminishes a reservation as to the land restored to the public domain.

*Yazzie* is consistent with a long line of lower federal court and state court decisions. *See, e.g., Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87, 90 (8th Cir.1975), *aff'd,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *United States ex rel. Condon v. Erickson,* 478 F.2d 684, 687–88 (8th Cir. 1973); *DeMarrias v. South Dakota,* 319 F.2d 845, 846 (8th Cir.1963); *Russ v. Wilkins,* 624 F.2d 914–15, 924, 927–29 (9th Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1976, 68 L.Ed.2d 296 (1981); *United States v. Southern Pacific Transp. Co.,* 543 F.2d 676, 696 (9th Cir.1976); *see also United States ex rel. Cook v. Parkinson,* 525 F.2d 120, 124 (8th Cir.1975), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *Putnam v. United States,* 248 F.2d 292, 295 (8th Cir.1957); *Russ v. Wilkins,* 410 F.Supp. 579, 581 (N.D.Cal.1976), *rev'd on other grounds,*

624 F.2d 914 (9th Cir.1980); *United States ex rel. Condon v. Erickson*, 344 F.Supp. 777, 778 (D.S.D.1972), *aff'd*, 478 F.2d 684 (8th Cir.1973); *Leech Lake Band of Chippewa Indians v. Herbst*, 334 F.Supp. 1001, 1005 (D.Minn.1971); *Lafferty v. State*, 80 S.D. 411, 125 N.W.2d 171, 174 (1963).

■ On the basis of the above, we conclude that operative statutory language that restores reservation land to the public domain is persuasive evidence of congressional intent to diminish the reservation as to the land so restored.

### B. Whether the Unallotted Lands Were Restored to the Public Domain Pursuant to the 1902 and 1905 Acts of Congress

Provisions in four statutes, the Indian Appropriation Acts of 1902, 1903, 1904, and 1905, dealt with the opening of the Uintah–Ouray Reservation. The next issue is whether, as a matter of statutory construction, the provision in the 1902 Act which stated that unallotted reservation lands would be "restored to the public domain" remained in effect when the Reservation was finally opened by a presidential proclamation in 1905. That issue turns on the language of the Acts in question.

For the reasons that follow, we hold that as a matter of statutory construction, the 1905 Act was merely amendatory and supplementary to the 1902 Act and therefore did not accomplish the opening of the Reservation independent of the 1902 Act. By way of a brief overview, we note that the pertinent statutes, legislative history, and contemporaneous and subsequent congressional, executive, and judicial constructions of the 1902 and 1905 Acts all show that the 1902 Act was considered the basic statute dealing with the opening of the Reservation and that the subsequent Acts did not repeal the 1902 Act's restoration language.

### 1. Establishment of the Uintah Reservation

The Indians who settled on the Uintah–Ouray Reservation consisted of several bands originally living in an area that included parts of what are now Colorado, Utah, and New Mexico. The Uintah Valley in eastern Utah was "set apart and reserved for the use and occupancy of Indian tribes" pursuant to an executive order issued by President Lincoln in 1861. I Kappler 900. In 1864, Congress authorized the Superintendent of Indian Affairs to bring together and settle in the Uintah Valley as many of the Indians living in the Utah Territory as practicable. Act of May 5, 1864, ch. 77, 13 Stat. 63. The Act set apart the Uintah Valley "for permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." Thus, the Reservation was neither created by treaty nor established for a specific tribe. Indeed, several different bands of Indians settled on the Reservation.

In 1888, the year after the enactment of the General Allotment Act, Congress, with the consent of the Indians, diminished the Uintah–Ouray Reservation by providing that approximately 7,000 acres, known as the Gilsonite Strip, were "to be public lands of the United States and restored to the public domain." Act of May 24, 1888, ch. 310, 25 Stat. 157. This Act concededly had the effect of diminishing the Reservation's boundaries. The United States District Court for the District of Utah so held in *Ute Indian Tribe v. Utah*, 521 F.Supp. 1072, 1099 (D.Utah 1981), and the Tribe did not appeal that ruling.

Congress first sought to open the Uintah Reservation to non-Indian settlement by the Indian Appropriations Act of 1894. Act of August 15, 1894, ch. 290, 28 Stat. 286, 337–38. The 1894 Act directed a commission to negotiate with the Indians for the "relinquishment to the United States" of lands not needed for allotments.[14] No

---

**14.** The 1894 Act also began the opening process on the neighboring Uncompahgre Reservation. The Act provided for a commission to determine which lands on the Uncompahgre Reservation were unsuited or not required for allotments so that such lands could be "restored to the public domain and made subject to entry...." Pursuant to the Act of June 7, 1897,

agreement, however, was forthcoming. In 1898, Congress provided for the "cession" of unallotted Indian lands on the Uintah–Ouray Reservation to the United States, subject to the consent of the Indians. Act of June 4, 1898, ch. 376, 30 Stat. 429. Again, because of Indian resistance, the purpose of this Act was not accomplished.

### 2. The Indian Appropriations Acts of 1902, 1903, 1904, and 1905

The Indian Appropriations Act of 1902 provided a comprehensive and detailed scheme for opening the Reservation. Act of May 27, 1902, ch. 888, 32 Stat. 245. In summary, the Act provided that (1) Indian consent was to be obtained; (2) allotments were to be made to the members of the Uintah and White River Tribes of Ute Indians, with 80 acres of irrigable, agricultural Reservation land allotted to each "head of the family" and 40 acres of such land allotted to each "other member of said tribes;" (3) the allotments were to be made prior to October 1, 1903; (4) all unallotted lands were to be "restored to the public domain" on October 1, 1903; (5) land opened for public entry under the homestead laws would be sold for $1.25 per acre; (6) the proceeds from the "sale of the lands so restored to the public domain" would be used first to reimburse the United States for money advanced to the Indians to effectuate the provisions of the Act and then for the benefit of the Uintah and White River Ute Indians; and (7) persons or companies having then-existing mineral leases approved by the Secretary of the Interior or permits to negotiate with the Indians for mineral leases on the Reservation were to have a preferential right, in lieu of such a lease or permit, to locate 640 acres of contiguous mining land under the mining laws up to "thirty days before said lands are restored to the public domain." It is important to note that the date fixed by the 1902 Act for restoring the unallotted lands to the public domain was also the date for opening the unallotted lands to public entry

and for completing the allotments of land to the Indians. Thus, the same date was critical to all three interrelated events.

The 1902 Act provided:

That *the Secretary of the Interior, with the consent thereto of the majority of the adult male Indians of the Uintah and the White River tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall be caused to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date all the unallotted lands within said reservation shall be restored to the public domain: Provided,* That persons entering any of said land under the homestead law shall pay therefor at the rate of one dollar and twenty-five cents per acre: *And provided further,* That nothing herein contained shall impair the rights of any mineral lease which has been approved by the Secretary of the Interior, or any permit heretofore issued by direction of the Secretary of the Interior to negotiate with said Indians for a mineral lease; but any person or company having so obtained such approved mineral lease or such permit to negotiate with said Indians for a mineral lease on said reservation, pending such time and up to thirty days before said lands are restored to the public domain as aforesaid, shall have in lieu of such lease or permit the preferential right to locate under the mining laws not to exceed six hundred and forty acres of contiguous mineral land, except the Raven Mining Company, which may in lieu of its lease locate one hundred mining claims of the character of mineral mentioned in its lease; and *the proceeds of the sale of the lands so restored to the public domain shall be applied, first, to the reimbursement of the Unit-*

---

ch. 3, 30 Stat. 62, 87, Congress mandated the allotment and opening of the Uncompahgre Reservation. *See Ute Indian Tribe,* 521 F.Supp. at 1105–10. We do not address the issue of whether the

Uncompahgre Reservation has been disestablished. The Tenth Circuit held that it was not. *Ute Indian Tribe,* 773 F.2d at 1090–93; *id.* at 1093–99 (Seymour, J., concurring).

*ed States for any moneys advanced to said Indians to carry into effect the foregoing provisions; and the remainder, under the direction of the Secretary of the Interior, shall be used for the benefit of said Indians.*

(Emphasis added.)

Less than a month after enactment of the 1902 Act, a Joint Resolution was passed on June 19, 1902, providing for the establishment of a tribal grazing reserve and for certain allotments of Uintah Reservation lands to be made to Uncompahgre Indians.[15] J.Res. 31, 57th Cong., 1st Sess., 32 Stat. 744, 745 (1902). The 1902 Joint Resolution affirmed the proposition that after the allotments were made to the Indians and the grazing reserve was established, the surplus lands were to be restored "to the public domain."[16]

Prior to October 1, 1903, it became apparent that the surveying necessary to make the allotments to the Indians could not be completed and Indian consent would not be forthcoming. Accordingly, Congress enacted the Act of March 3, 1903, ch. 994, 32 Stat. 982, 997–98. That Act specifically amended the 1902 Act in three respects: (1) It dispensed with the requirement that the Indians give their consent to the opening of the Reservation and the allotment program, although their consent was to be initially solicited; (2) it changed the October 1, 1903 date for "opening the unallotted lands to public entry on said Uintah Reservation as provided by the Act of May twenty-seventh nineteen hundred and two" to October 1, 1904; and (3) it provided that the grazing reserve established by the 1902 Joint Resolution should be limited to 250,000 acres and should be located on lands south of the Strawberry River.[17] The provision in the 1903 Act that

15. Although the 1902 Joint Resolution provided for allotments on the Uintah Reservation to Uncompahgre Utes, the Uncompahgre Utes did not share in the proceeds from the opened lands.

16. The 1902 Joint Resolution provided in part:
 In addition to the allotments in severalty to the Uintah and White River Utes of the Uintah Indian Reservation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock.
 All allotments hereafter made to Uncompahgre Indians of lands in said Uintah Indian Reservation shall be confined to agricultural land which can be irrigated, and shall be on the basis of eighty acres to each head of a family and forty acres to each other Indian, and no more. The grazing land selected and set apart, as aforesaid in the Uintah Indian Reservation for the use in common of the Indians of that reservation shall be equally open to the use of all Uncompahgre Indians receiving allotments in said reservation of the reduced area here named.
 . . . .
 *The item of seventy thousand and sixty-four dollars and forty-eight cents appropriated by the Act which is hereby supplemented and modified, to be paid to the Uintah and White River tribes of Ute Indians in satisfaction of certain claims named in said Act, shall be paid to the Indians entitled thereto without*

*awaiting their action upon the proposed allotment in severalty of lands in that reservation and the restoration of the surplus lands to the public domain.*
(Emphasis added.)

17. The 1903 Act stated in pertinent part:
 To enable the Secretary of the Interior to do the necessary surveying and otherwise carry out the purpose of so much of the act of May twenty-seventh, nineteen hundred and two, making appropriation for the current and contingent expenses of the Indian Department for the fiscal year nineteen hundred and three, and for other purposes, as provides for the allotment of the Indians of the Walker River Reservation in Nevada, and the Uintah and White River Utes in Utah, and the joint resolution of June nineteenth, nineteen hundred and two, providing for the allotment of the Indians of Spokane Reservation in Washington, to be immediately available, one hundred and seventy-five thousand dollars: *Provided, however,* That the Secretary of the Interior shall forthwith send an inspector to obtain the consent of the Uintah and White River Ute Indians to an allotment of their lands as directed by the act of May twenty-seventh, nineteen hundred and two, and if their consent, as therein provided, can not be obtained by June first, nineteen hundred and three, then the Secretary of the Interior shall cause to be allotted to each of said Uintah and White River Ute Indians the quantity and character of land named and described in said act: *And provided further,* That the grazing lands to be set apart for the use of the Uintah, White River Utes, and other Indians,

the allotments to the Indians and the opening of the Reservation would proceed even without Indian consent was apparently based on the United States Supreme Court's decision in *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), decided January 5, 1903, which held that Congress could unilaterally diminish a reservation.[18]

The 1903 Act also appropriated additional funds to pay for the surveying necessary to make the allotments to the Indians under the terms of the 1902 Act. Although the 1903 Act did not itself contain restoration language, it was clearly understood that the restoration language of the 1902 Act remained in effect.

Pursuant to the statutory direction, Indian consent was solicited. The Bureau of Indian Affairs instructed Inspector James McLaughlin to meet with the Indians and explain the provisions of the 1902 and 1903 Acts and, if possible, obtain their consent to the congressional program for the allotment of lands to the Indians and the restoration of the surplus lands to the public domain. *See* Letter from Acting Commissioner of Indian Affairs to James McLaughlin, United States Indian Inspector, at 5 (April 29, 1903). Inspector McLaughlin met with the Indians in May 1903 and explained that the allotments would be made with or without their consent and that the Reservation would be diminished. Minutes of Councils Held by James McLaughlin, U.S. Indian Inspector, with the Utah and White River Ute Indians at Uintah Agency, Utah, from May 18 to 23, 1903, at 34–35. He explicitly explained

the congressional intent to diminish the Reservation:

> My friends, Red Cap said my talk was cloudy, and you do not understand it. You are the people who are in the dark in regard to the force of this act of congress, and I am trying to bring you into the light. *You say that line is very heavy and that the reservation is nailed down upon the border. That is very true as applying to the past many years and up to now, but Congress has provided legislation which will pull up the nails which hold down that line and after next year there will be no outside boundary line to this reservation. Each of you will have a boundary to your individual holdings and there will also be a border to that 250,-000 acre tract set apart for pasturage.*

*Id.* at 42 (emphasis added).

The surveying necessary to make allotments to the Indians could not be completed by October 1, 1904, the date fixed in the 1903 Act for opening the Reservation. As a result, in 1904, Congress amended the 1902 and 1903 Acts and extended the time for making allotments and opening the unallotted lands to entry to March 10, 1905. Act of April 21, 1904, ch. 1402, 33 Stat. 189, 207–08. The 1904 Act also appropriated additional funds to complete the necessary surveying and to "otherwise carry out the purposes of so much of the act of May twenty-seventh, nineteen hundred and two ... as provides for the allotment of the Indians of the Uintah and White River Utes in Utah."[19] All other terms of the 1902

---

as provided by public resolution numbered thirty-one, of June nineteenth, nineteen hundred and two, be confined to the lands south of the Strawberry River on said Uintah Reservation, and shall not exceed two hundred and fifty thousand acres: *And provided further,* That the time for opening the unallotted lands to public entry on said Uintah Reservation, as provided by the act of May twenty-seventh, nineteen hundred and two, be, and the same is hereby, extended to October first, nineteen hundred and four.

**18.** In *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 587–88, 97 S.Ct. 1361, 1363–64, 51 L.Ed.2d 660 (1977), the Supreme Court specifically relied on *Lone Wolf* in holding that the absence of

Indian consent did not defeat congressional intent to diminish or disestablish a reservation. *See also Solem v. Bartlett,* 465 U.S. 463, 471 n. 11, 104 S.Ct. 1161, 1166 n. 11, 79 L.Ed.2d 443 (1984).

**19.** The 1904 Act provided in its entirety:

> That the time for opening the unallotted lands to public entry on the Uintah Reservation, in Utah, as provided by the acts of May twenty-seventh, nineteen hundred and two, and March third, nineteen hundred and three, be, and the same is hereby, extended to March tenth, nineteen hundred and five, and five thousand dollars is hereby appropriated to enable the Secretary of the Interior to do the

Act, including the language restoring the unallotted lands to the public domain, were left intact.

Once again, however, the time fixed for making allotments and opening the unallotted lands to public entry could not be met. In early 1905, a Senate Resolution directed the Secretary of the Interior to report on the progress that had been made in making the allotments to the Indians under the provisions of the 1902 Act. S. Res., 39 Cong.Rec. 1863 (1905). The Secretary of the Interior responded in a letter, explaining at some length the steps taken "to comply with the provisions of the Act of May 27, 1902" and why the delay in opening the Reservation had occurred. S. Doc. No. 159, 58th Cong., 3d Sess. 1, 2–4 (1905). Attached to the Secretary's letter was a report from the Commissioner of Indian Affairs stating that still more time was necessary to complete the allotment process. *Id.* at 21–22. Because of the delay, the time for completing the allotments and opening the Reservation had to be extended again.

On March 3, 1905, prior to the date fixed for opening the Reservation by the 1904 Act, Congress enacted the Indian Appropriations Act of 1905. Act of March 3, 1905, ch. 1479, 33 Stat. 1048, 1069–70. The 1905 Act expressly amended the date fixed by the 1904 Act "for opening to public entry the unallotted lands on the Uintah Reservation" and established September 1, 1905, as the new date "for opening said reservation," but authorized the President to fix the opening at an earlier date.[20] The 1905

---

necessary surveying, and otherwise carry out the purposes of so much of the act of May twenty-seventh, nineteen hundred and two, making appropriation for the current and contingent expenses of the Indian Department for the fiscal year nineteen hundred and three, and for other purposes, as provides for the allotment of the Indians of the Uintah and White River Utes in Utah.

**20.** The pertinent part of the 1905 Act provided:

That so much of the act of March third, nineteen hundred and three, as provides that the grazing lands to be set apart for the use of the Uintah, White River Utes, and other Indians on the Uintah Reservation, as provided by public resolution numbered thirty-one of June nineteenth, nineteen hundred and two, shall be confined to the lands south of the Strawberry River, be, and the same is hereby, repealed.

*That the time for opening to public entry the unallotted lands on the Uintah Reservation in Utah having been fixed by law as the tenth day of March, nineteen hundred and five, it is hereby provided that the time for opening said reservation shall be extended to the first of September, nineteen hundred and five,* unless the President shall determine that the same may be opened at an earlier date and *that the manner of opening such lands for settlement and entry, and for disposing of the same, shall be as follows:* That the said unallotted lands, excepting such tracts as may have been set aside as national forest reserve, and such mineral lands as were disposed of by the act of Congress of May twenty-seventh, nineteen hundred and two, shall be disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; and no person shall be permitted to settle upon, occupy, or enter any of such lands, except as prescribed in said proclamation, until after the expiration of sixty days from the time when the same are thereby opened to settlement and entry: *Provided,* That the rights of honorably discharged Union soldiers and sailors of the late Civil and the Spanish War or Philippine insurrection, as defined and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes, as amended by the act of March first, nineteen hundred and one, shall not be abridged: *And provided further,* That all lands opened to settlement and entry under this act remaining undisposed of at the expiration of five years from the taking effect of this act shall be sold and disposed of for cash, under rules and regulations to be prescribed by the Secretary of the Interior, not more than six hundred and forty acres to any one person. The proceeds of the sale of such lands shall be applied as provided in the act of Congress of May twenty-seventh, nineteen hundred and two, and the acts amendatory thereof and supplemental thereto.

That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, and subject to the mineral rights granted by the act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary, and he may also set apart and reserve any reservoir site or other lands necessary to conserve and

Act also repealed a portion of the 1903 Act that limited the location of the grazing reserve to the lands south of the Strawberry River. In addition, the Act added provisions authorizing the President to set apart Reservation lands for an addition to the Uintah Forest Reserve and for protecting the Indians' water supply or for general agricultural development.

Significantly, the language of the 1905 Act did not provide for the opening of the Uintah Reservation—that was done by the 1902 Act. Rather, the 1905 Act merely provided, *"That the time for opening said reservation shall be extended to the first of September, nineteen hundred and five . . .,"* and then specified only *"The manner of opening. . . ."* (Emphasis added.) The position of the Tenth Circuit in *Ute Indian Tribe* that the 1905 Act "opened" the Reservation simply is not, in our view, consistent with the language of the Act. On its face, the 1905 Act merely set a new date for when the opening was to occur and the manner of such opening. The operative statutory language which actually provided for the opening of the unallotted lands was found in the 1902 Act.

Clearly, nothing in the language of the 1905 Act indicates that Congress intended to repeal either the 1902 Act in total or the language of the 1902 Act restoring the unallotted lands to the public domain. Nor is there anything in the legislative history of the 1905 Act to that effect. On the contrary, in enacting the 1905 Act, Congress acted on the premise that the provisions of the 1902 and 1903 Acts and the 1902 Joint Resolution continued in effect. Indeed, with surgical precision, Congress expressly repealed a specific, but minor, part of the 1903 Act dealing with the location of the grazing reserve.

■ The language of the 1905 Act shows that Congress intended to amend the 1902 Act only by limiting "the manner of opening" the lands. The Act restricted initial entry on the opened lands to settlement under the homestead and town-site laws for a period of five years; after that, the lands were to be sold for cash in parcels not larger than 640 acres. The purpose of the amendment was to prevent the opened lands from falling into the hands of land speculators and to assure that the opened land would initially be used for agricultural purposes. *See* 39 Cong.Rec. 1185–86 (1905); *Indian Appropriation Bill, 1906: Hearings before the Subcomm. of the Comm. on Indian Affairs of the Senate,* 58th Cong., 3d Sess. 29–30 (1905).

The temporary limitation on the manner of entry under the homestead and town-site laws was patterned after the scheme used in the opening of the Rosebud Reservation. *See* 39 Cong.Rec. 1183 (1905). In *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 608, 97 S.Ct. 1361, 1374, 51 L.Ed.2d 660 (1977), the Court set out section 2 of the 1907 Act that was at issue there:

> Section 2 provides for the disposition of lands under the "general provisions of the homestead and town-site laws," while § 3 specifies land purchase prices, with the proviso that "any lands remaining unsold after the said lands have been opened to entry for seven years may be sold to the highest bidder for cash, without regard to the above minimum limit of price."

The Court saw nothing inconsistent with the diminishment of the Rosebud Sioux Reservation and the provisions temporarily limiting entry into the opened lands. *Id.* at 609, 97 S.Ct. at 1374. Similarly, in *DeCoteau v. District County Court,* 420 U.S. 425, 442, 449, 95 S.Ct. 1082, 1091, 1095, 43 L.Ed.2d 300 (1975), the Court held that an 1891 Act terminated the Lake Traverse Indian Reservation despite a provision in the Act opening lands "only to entry and settlement [at $2.50 per acre] under the homestead and townsite laws of the United States."

protect the water supply for the Indians or for general agricultural development, and may confirm such rights to water thereon as have already accrued: *Provided,* That the proceeds from any timber on such addition as may with safety be sold prior to June thirtieth, nineteen hundred and twenty, shall be paid to said Indians in accordance with the provisions of the act opening the reservation. (Emphasis added.)

In sum, the language and legislative history of the 1905 Act show that Congress intended only to amend specific aspects of the 1902, 1903, and 1904 Acts and to provide additional authority to the President to set aside Reservation lands for specific uses. Except as specifically amended, Congress did not intend to change the basic features of the 1902 and 1903 Acts.[21] All language in the earlier Acts not specifically amended or repealed remained part of the statutory scheme dealing with the opening of the Reservation. Thus, after enactment of the 1905 Act, the 1902 Act remained in full force and effect with respect to (1) providing for allotments to heads of households and members of the Uintah and White River Tribes and for the amount of acreage for each allotment; (2) restoring the unallotted lands to the public domain; (3) fixing the price to be paid per acre by homesteaders; (4) providing how and to whose benefit the proceeds derived from the sale of the unallotted lands were to be applied; and (5) protecting certain mineral rights. Of course, the provision in the 1902 Joint Resolution establishing the grazing reserve also remained in effect, although the 1905 Act repealed one minor aspect of the 1903 Act having to do with the location of the reserve.

We conclude that the 1902 Act established the basic statutory authority for opening the Uintah Reservation and that Congress intended thereby to diminish the Reservation. The congressional intent to diminish, as well as other essential aspects of the opening of the Reservation that were established by the 1902 Act, remained in full force and effect through the enactment of the 1902 Joint Resolution and the 1903, 1904, and 1905 Acts. The 1902 Act established more than a "baseline purpose" of restoring unallotted, unreserved lands to the public domain. See Rosebud, 430 U.S. at 592, 97 S.Ct. at 1366. The Act, on its face, provided for the opening of the Uintah Reservation. In short, the restoration

language of the 1902 Act was operative statutory language when the opening finally occurred in 1905.

3. Contemporaneous and Subsequent Construction of the 1902 and 1905 Acts

The conclusion that the 1902 Act established the basic principles governing the opening of the Uintah Reservation is confirmed by subsequent presidential proclamations, congressional acts, executive department orders, and court decisions.

As stated earlier, the 1905 Act authorized the President to open the Reservation prior to September 1, 1905. The actual opening of the Reservation was effectuated by the Presidential Proclamation of July 14, 1905, 34 Stat. 3119. The Proclamation expressly recognized the continuing operative effect of the 1902 Act and the public domain language therein, as well as the amendatory nature of the 1903, 1904, and 1905 Acts. The Proclamation stated that the time for opening the unallotted lands of the Uintah Reservation had been extended by the 1903, 1904, and 1905 Acts. More importantly, the Proclamation recognized the disestablishment of the Reservation as to the unallotted lands by quoting the language of the 1902 Act that the unallotted lands in the Uintah Reservation " 'shall be restored to the public domain.' " The Proclamation also quoted the language in the 1902 Act that fixed the price to be paid for homesteaded land: " 'persons entering any of said lands under the homestead laws shall pay therefor at the rate of one dollar and twenty-five cents per acre.' "[22] The Proclamation stated in pertinent part:

*Whereas it was provided by the Act of Congress, approved May 27, A.D., 1902 (32 Stat., 263), among other things, that on October first, 1903, the unallotted lands in the Uintah Indian Reservation, in the State of Utah, "shall be*

---

**21.** Unlike the 1902 and 1903 Acts, the 1904 Act added nothing substantive to the overall statutory scheme. It only extended the time for the opening.

**22.** That the 1905 Act failed to fix a specific price to be paid for opened lands does not militate against diminishment. See Solem, 465 U.S. at 471, 104 S.Ct. at 1166; Rosebud, 430 U.S. at 596 n. 18, 97 S.Ct. at 1368 n. 18.

restored to the public domain: *Provided, That persons entering any of said lands under the homestead laws shall pay therefor at the rate of one dollar and twenty-five cents per acre."*

*And, whereas, the time for the opening of said unallotted lands was extended to October 1, 1904, by the Act of Congress approved March 3, 1903 (32 Stat., 998), and was extended to March 10, 1905, by the Act of Congress approved April 21, 1904 (33 Stat., 207), and was again extended to not later than September 1, 1905, by the Act of Congress, approved March 3, 1905 (33 Stat., 1069)....*

....

Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said Acts of Congress, do hereby declare and make known that all the unallotted lands in said reservation, excepting such as have at that time been reserved for military, forestry and other purposes, and such mineral lands as may have been disposed of under existing laws, will on and after the 28th day of August, 1905, in the manner hereinafter prescribed, and not otherwise, be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws of the United States....

*Id.* at 3119–20 (emphasis added).

By quoting the language from the 1902 Act that "restored" the unallotted land to "the public domain" and fixed the price to be paid per acre by homesteaders, the Proclamation demonstrates that the President deemed both provisions to be operative statutory positions governing the opened lands. The additional citation to the 1903, 1904, and 1905 Acts indicates that the President considered all four Acts relevant to the opening of the Reservation to public entry. The presidential conclusion that the 1902 Act restored the opened land "to the public domain" is an unambiguous and contemporaneous statement by the nation's Chief Executive as to how the 1902 and 1905 Acts should be construed and is there-

fore entitled to significant weight. *See Rosebud*, 430 U.S. at 602–03, 97 S.Ct. at 1371.

In addition, the Presidential Proclamation of September 1, 1906, 34 Stat. 3228, confirms the proposition that Congress intended that the unallotted lands be restored to the public domain and that the Reservation be diminished under the 1902 Act. The 1906 Proclamation dealt with a homestead entry that infringed on the Indian grazing reserve established by the 1902 Joint Resolution, as amended by the 1903 and 1905 Acts. The Proclamation adopted essentially the same construction of the operative Acts as the 1905 Proclamation. It implicitly recognized the diminishment of the boundaries of the Reservation by referring to the "former Uintah Indian Reservation in Utah" and by "restor[ing]" a small parcel of land from the grazing reserve "to the public domain" so as to make it subject to entry. The parcel had been erroneously located on a small part of the reserve and had been improved by the homesteader. Had the surplus reservation lands not been restored to the public domain by the 1902 Act, it would have been pointless to transfer the parcel from the grazing reserve to the public domain. The Proclamation stated:

WHEREAS, the Secretary of the Interior, on July 11, 1905, *under the authority of the act of June 19, 1902 (32 Stats., 744) amended by the act of March 3, 1903 (32 Stats., 982, 998), and March 3, 1905 (33 Stats., 1048, 1069), reserved certain lands in the former Uintah Indian Reservation in Utah,* including Lots 2 and 13 in Sec. 10, T. 2 S., R. 1 E., containing 8.80 acres, for the Uintah Indian Grazing Reserve; and whereas, the President of the United States in his proclamation of July 14, 1905, opening the lands in the said Uintah Reservation to settlement and entry, excepted from such opening the lands included in said grazing reserve; and whereas one David Eskelson was, on September 26, 1905, erroneously allowed to include in his homestead entry No. 806, the said Lots 2 and 13, on which lots he has placed valuable improvements, and which, by virtue

of their small area and being entirely segregated from the balance of the grazing reserve by the claims of the Raven Mining Company, are of no value as a part of said reserve:

Now, therefore, I, THEODORE ROOSEVELT, President of the United States, by virtue of the power in me vested, do hereby declare and make known that the *lots numbered 2 and 13 of Section 10, Township 2 S., of Range 1 E., Uintah Special Meridian, in Utah, are hereby restored to the public domain.*

(Emphasis added.)

Congressional enactments after 1905 dealing with the Reservation were also based on the premise that the public domain language in the 1902 Act diminished the Reservation's boundaries. In every instance of which we are aware, the 1903, 1904, and 1905 Acts were viewed as amendatory and supplementary to the 1902 Act and as consistent with the proposition that the opened lands had been restored to the public domain.

A 1906 Act extended the time for homesteaders to establish their residence on the opened lands. Act of January 27, 1906, 34 Stat. 9. The Act specifically referred to the unallotted Uintah Reservation lands as *"heretofore a part of the Uinta Indian Reservation,* within the counties of Uinta and Wasatch, in the State of Utah, *opened under the Acts of May twenty-seventh, nineteen hundred and two, and March third, nineteen hundred and three, and March third, nineteen hundred and five."* (Emphasis added.) Similarly, in 1912, Congress provided an extension of time to make payment and proof of entry for "any person who has heretofore made a homestead entry *for land which was formerly a part of the Uintah Indian Reservation* in the State of Utah, *authorized by the Act approved May twenty-seventh, nineteen hundred and two, and Acts amendatory*

*thereto . . . ."* Act of July 20, 1912, ch. 244, 37 Stat. 196–97 (emphasis added).

Both the 1906 and the 1912 Acts are similar to a 1905 Act discussed in *Rosebud* that extended the time for settlers to establish homesteads on former lands of the Rosebud Sioux Reservation. That Act referred to " 'lands which were *heretofore* a part of the Rosebud Indian Reservation.' " *Rosebud,* 430 U.S. at 603 n. 25, 97 S.Ct. at 1371 n. 25 (emphasis in original). The Supreme Court characterized this statutory language as "additional evidence of the congressional intent to disestablish." The same conclusion applies here.

The Indian Appropriations Acts of 1910 and 1911 provide still further evidence of diminishment. The 1910 Act appropriated $5000 for the straightening of the Duchesne River "to be reimbursed to the United States out of the proceeds of the sale of lands within the *ceded* Uintah Indian Reservation opened to entry under the Act of May twenty-seventh, nineteen hundred and two." (Emphasis added.) Similarly, the 1911 Act provided $15,000 to build a bridge across the Duchesne River. Act of March 3, 1911, ch. 210, 36 Stat. 1073–74. The funds were to be reimbursed to the United States from the "sale of lands within the *ceded* Uintah Indian Reservation open to entry under the act of May twenty-seventh, nineteen hundred and two." (Emphasis added.) The term "ceded" in the 1910 and 1911 Acts may be technically misused, but in the context of the Acts, the term clearly refers to land that was detached from the Reservation by the 1902 Act. *See Rosebud,* 430 U.S. at 597–98, 97 S.Ct. at 1368–69.

The 1910 Act also appropriated funds to pay the Indians for land in the "former Uintah Indian Reservation" that was set apart by the President under the authority of the 1905 Act for reservoir and irrigation purposes in connection with the Strawberry River reclamation project.[23] Act of April 4, 1910, ch. 140, 36 Stat. 284–85. The funds

**23.** Pursuant to the authority of the 1905 Act, the President withdrew 56,000 acres for the Strawberry River reclamation project. Presidential Proclamation of August 3, 1905, 34 Stat. 3141.

This withdrawal diminished the Reservation. *See Ute Indian Tribe,* 716 F.2d at 1314, *rev'd on other grounds,* 773 F.2d 1087.

that were to be paid the Indians for this land were to be provided by the owners of the lands irrigated by the project. The 1910 Act also provided, "All right, title, and interest of the Indians in the said lands are hereby extinguished, and the title management and control thereof shall pass to the owners of the lands irrigated from said project." 36 Stat. 285.

The use of extinguishment language in the 1910 Act does not support a conclusion that Congress would have used this type of explicit language of diminishment in the 1902 Act if Congress had intended to diminish the Reservation. The lands that were detached from Indian ownership and jurisdiction under the 1910 Act passed directly from the Reservation as it existed *after* 1905 to a specific type of private use and did not ever become part of the public domain. Indeed, because of the specified use to which the detached lands were put, it would have been inappropriate to restore those lands to the public domain. For that reason, the more explicit diminishment language in the 1910 Act was necessary.

Statements of executive department officials and congressional committees have also consistently concluded that the opened lands were restored to the public domain by the 1902 Act. In 1911, E.P. Holcombe and James M. McLaughlin filed a report with the Department of the Interior concerning the Uintah Reservation. The report stated that on July 14, 1905, "the President issued a proclamation opening the lands to entry August 28, 1905, ... and there were restored to the public domain to be disposed for the benefit of the Indians about 1,004,005 acres." [24] H.R. Doc. No. 892, 62d Cong., 2d Sess. 1–2 (1912). A 1941 report of the Senate Committee on Indian Affairs, issued before the 1945 Order of Restoration, discussed *infra*, and before the addition of the Hill Creek Extension, stated:

The Uintah and Ouray Indian Reservation was established in 1861 for the Uintah, Uncompahgre, and White River

Bands of Ute Indians. The original area of the reservation was approximately 2,039,040 acres. Cessions were made to the United States at various times so that at present the reservation embraces but 366,000 acres or less than one-fifth of the original.

S.Rep. No. 243, 77th Cong., 1st Sess. 3 (1941); *see also,* H.R.Rep. No. 2047, 69th Cong., 2d Sess. 2 (1927); H.R.Rep. No. 2503, 82d Cong., 2d Sess. 2, 3 (1952).

Official action of the Secretary of the Interior also provides persuasive evidence of executive department recognition of diminishment. In 1934, Congress authorized the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States...." Act of June 18, 1934, ch. 576, 48 Stat. 984. In 1945, the Secretary of the Interior issued an "Order of Restoration" pursuant to the 1934 Act that restored to the Uintah Reservation 217,000 acres of the undisposed, opened lands that remained in the public domain. That Order restored both the *ownership* of those lands to the Tribe and, by making the lands part of the Reservation, the *tribal jurisdiction* over them. The Order stated:

Whereas, pursuant to the provisions of the act of May 27, 1902 (32 Stat., 263), as amended, the unallotted lands of the Uintah and Ouray Indian Reservation in the State of Utah, were made subject to disposal under the laws of the United States applying to public lands, and

Whereas, there are now remaining undisposed of within said area approximately 217,000 acres of unallotted lands, which need closer administrative control in the interest of better conservation practices, and

Whereas, by relinquishment and cancellation of homestead entries within this area a limited additional acreage of land

---

24. We note that this acreage figure is difficult to reconcile with other figures in this opinion dealing with the amount of land restored to the

public domain, *see supra* at 8–9 & n. 10, and appears inaccurate.

of similar character may later be included within this class of undisposed-of opened land, and

Whereas, the Tribal Council, the Superintendent of the Uintah and Ouray Agency, and the Commissioner of Indian Affairs have recommended restoration to tribal ownership of such undisposed-of surplus unallotted lands in the said reservation,

Now, therefore, by virtue of the authority vested in the Secretary of the Interior by sections 3 and 7 of the act of June 18, 1934 (48 Stat. 984), I hereby find that the restoration to tribal ownership of *all lands which are now or may hereafter be classified as undisposed-of opened lands of the Uintah and Ouray Reservation* will be in the public interest, and the said lands *are hereby restored to tribal ownership* for the use and benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah, *and are added to and made a part of the existing reservation, subject to any valid existing rights.*

Order Notice, 10 Fed.Reg. 12,409 (1945) (emphasis added).

 The law is clear that if mere legal title to opened surplus lands passed to non-Indians, such lands remained part of the reservation, and restoring the opened lands to tribal ownership would have no effect on their status as reservation lands, since by definition they never left the reservation. But if tribal boundaries were diminished when the surplus lands were opened, the return of those lands to the reservation would enlarge the boundaries of the reservation. *See Solem,* 465 U.S. at 467–68, 104 S.Ct. at 1164–65. Thus, in restoring both the ownership of and the jurisdiction over the lands to the Tribe, the 1945 Order of Restoration was premised squarely on the proposition that the 1902 Act disestablished the Reservation as to the opened lands.

More recent evidence that the restoration language of the 1902 Act was operative at the time of the opening is found in a 1971 order of the Secretary of the Interior revoking a 1930 withdrawal of oil shale lands because the initial withdrawal had clouded title to part of the Uintah Reservation grazing and timber reserve, the allotted lands, and the lands restored to the public domain by the 1902 Act and later restored to the Reservation under the 1945 Order of Restoration. Order Notice, 36 Fed.Reg. 19,920 (1972). The 1971 Order recited the legal history of the Reservation, including the restoration of the "unallotted lands of the Uintah and Ouray Indian Reservation ... to the public domain." Part of the Order stated:

Whereas, pursuant to the provisions of the Act of May 27, 1902 (32 Stat. 263), as amended and supplemented by the Acts of March 3, 1903 (32 Stat. 998); April 21, 1904 (33 Stat. 207); March 3, 1905 (33 Stat. 1069); and May 14, 1920 (41 Stat. 599); most of the unallotted lands of the Uintah and Ouray Indian Reservation in Utah were restored to the public domain with the proceeds from the sale of said lands to be used for the benefit of the Indians....

In addition, both the Department of Justice and the Ute Tribe have formally stipulated that the unallotted, opened lands were restored to the public domain by the 1902 Act. In its amicus brief filed in connection with the petition for a writ of certiorari in *Ute Indian Tribe,* the Department noted that both it and the Uintah and White River Bands of Ute Indians had stipulated that the Indians on the Uintah–Ouray Reservation " 'received individual allotments thereon pursuant to the Act of May 27, 1902, as amended,' and that surplus lands were 'restored to the public domain' pursuant to the 1902 Act 'and amendments thereto.' " [25] The stipulation was filed with

25. Brief of the United States in opposition as Amicus Curiae, *Utah v. Ute Indian Tribe,* on petition for writ of certiorari to the United States Court of Appeals for the Tenth Circuit, No. 85–1821, October Term 1986, at 13 n. 7, *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d

596 (1986). The Department of Justice stated in its amicus brief, "The quoted passages do not suggest that the 1902 Act was the sole basis for allotment and opening; to the contrary, they make clear that the substantive provisions of the 1902 Act were 'amended.' " That point, howev-

the Court of Claims in conjunction with the litigation in *Uintah and White River Bands of Ute Indians v. United States,* 152 F.Supp. 953, 139 Ct.Cl. 1 (1957).

The Ute Tribe has also acknowledged that the Reservation had been diminished. The Tenth Circuit's panel opinion in *Ute Indian Tribe* stated:

[T]he 1957 Ute Ten Year Development Program provides a description of the total acreage of the Uintah and Ouray reservation as currently containing 1,010,000 acres. In detail, it delineates, "The original area of the Uintah Reservation in Wasatch, Duchesne and Uintah Counties [was] reduced as follows...." (The document then details the Gilsonite Strip reduction, the 1905 addition to the Uintah Forest Reserve, the Strawberry River reduction, the 1902 grazing reserve and allotments to individual Indians and "[a]pproximately 798,877 acres were disposed of by the United States for cash, or otherwise set aside and taken for its own use at various times since the opening of the reservation in 1905.").

*Ute Indian Tribe v. Utah,* 716 F.2d 1298, 1313 (10th Cir.1983), *vacated,* 773 F.2d 1087 (10th Cir.1985) (en banc).

As recently as 1977, the Forest Service took the position that the Ashley and Uintah National Forests and the High Uintah Wilderness were not part of the Reservation because "the original Uintah Reservation boundaries were disestablished and the present Reservation boundaries include only the trust lands." [26] Moreover, Department of Interior officials have consistently viewed only the trust lands (the tribal grazing reserve, allotments, and land later re-

stored to tribal ownership and reservation status) as the lands that lie within the Reservation.[27]

Finally, a number of court decisions have also stated or held that the language in the 1902 Act restoring the unallotted lands to the public domain was operative when the Reservation was opened in 1905 and that the 1905 Act simply extended the time for opening the unallotted, unreserved lands to public entry. In *Sowards v. Meagher,* 37 Utah 212, 108 P. 1112 (1910), the issue was whether an application was properly made to the Utah State Engineer for an award of water rights to be used on land that was opened to public entry in 1905. This Court reviewed the statutes dealing with the opening of the Reservation, beginning with the 1902 Act, and stated:

It may be judicially noticed, and here stated, that Congress in 1902 ordered the unallotted lands of the Indian reservation referred to in the complaint to be restored to the public domain on the 1st day of August, 1903. That time was extended to October 1, 1904, and again to March 10, 1905. On March 3, 1905, Congress again extended such time to September 1, 1905, but authorized the President of the United States by proclamation to fix an earlier time. Thereupon, the President, on the 14th day of July, 1905, issued a proclamation restoring the unallotted lands of the reservation to the public domain, and declaring such lands open to entry, settlement, and disposition on and after the 28th day of August, 1905.

---

er, has never been contested. What is significant is that the Department formally acknowledged in court that the surplus lands had been restored to the public domain pursuant to the 1902 Act and the amendments thereto.

**26.** Brief of Duchesne and Uintah Counties as Amici Curiae, at 16 (quoting Letter from United States Forest Service to Scott M. Matheson, Governor of Utah (April 8, 1977)).

**27.** H.R.Rep. No. 5010, 59th Cong., 1st Sess. 1–2 (1906); Letter from C.F. Darrabee, Acting Commissioner of Office of Indian Affairs to H.C. Means, Superintendent of Irrigation Survey,

Whiterocks, Utah 1–2 (September 26, 1907); Letter from First Assistant Secretary of Department of the Interior to Commissioner of Indian Affairs (November 8, 1907); Letter from Secretary of the Department of the Interior to Secretary of the Treasury (December 19, 1908); 1929 Annual Report of Uintah and Ouray Agency, Fort Duchesne, Utah 1; 1931 Annual Report of Uintah and Ouray Agency, Fort Duchesne, Utah 4–6; 1932 Annual Report of Uintah and Ouray Agency, Fort Duchesne, Utah 1–2; Bureau of Indian Affairs, Phoenix Area Office, *Information Profiles of Indian Reservations in Arizona, Nevada, & Utah* 155 (1976).

108 P. at 1114. Although it cannot be said, as a technical matter, that the *Sowards* opinion specifically addressed the question of whether the Reservation was disestablished as to the lands that were returned to the public domain, it is clear that this Court held that the 1905 Act amended the 1902 Act and that the 1902 Act restored the open, unallotted lands to the public domain. *See also White Rocks Irrigation Co. v. Mooseman*, 45 Utah 79, 141 P. 459, 460 (1914).

The Court of Claims' opinion in *Uintah and White River Bands of Ute Indians v. United States*, 139 Ct.Cl. 1 (1957), reached the same conclusion. That case awarded compensation to the Uintah and White River Utes for the withdrawal by the United States of the lands that were set apart and added to the Uintah Forest Reserve pursuant to the 1905 Act. In the course of the opinion, the court stated that after the allotments to the Indians were made, the surplus lands were opened to public entry and the proceeds from these lands totalling $1,184,996.33 were credited to the account of the Uintah and White River Utes. *Id.* at 22. With respect to the 1902 Act, the court stated that "surplus lands (with the exception of forest reserve and reclamation withdrawals and certain mineral entries) were restored to the public domain, and opened for disposition under the public land laws for the benefit of the Indians." *Id.*

The same construction was placed on the 1902 and 1905 Acts by the Court of Appeals for the Tenth Circuit in *Hansen v. United States*, 153 F.2d 162 (10th Cir.1946). *Hansen* held that the 1902 Act restored the unallotted lands "to the public domain" and that the 1903, 1904, and 1905 Acts "extended the time for opening the unallotted lands to the public domain." *Id.* at 163. This opinion was handed down just a few months after the 1945 Order of Restoration by the Secretary of the Interior and apparently without knowledge of it, for the Court noted, "Approximately 220,000 acres of the lands restored to the public domain by the Act of May 27, 1902, remain undisposed of." *Id.*

In *United States v. Boss*, 160 Fed. 132 (D.Utah 1906), the United States District Court for the District of Utah dismissed an indictment which charged that the defendant knowingly introduced intoxicating liquor into Indian country in violation of federal law. The crime had occurred after the opening of the Uintah Reservation in 1905 on unallotted land that had been reserved by the Secretary of the Interior for school and Uintah Agency purposes. The court traced the legislative history of the Uintah Reservation, including the interdependence of the 1902 and 1905 Acts, and found *Ex parte Dick*, 141 Fed. 5 (9th Cir. 1905), *rev'd on other grounds*, 202 U.S. 132, 26 S.Ct. 584, 50 L.Ed. 963 (1906), dispositive. In *Dick*, the Ninth Circuit vacated the federal conviction of a defendant for knowingly introducing intoxicating liquor into Indian country because the crime had occurred on land over which the state had exclusive jurisdiction. The sale of liquor in *Dick* occurred on Nez Perce Reservation land that had been ceded to the United States by a congressional act and sold to a municipal corporation. The court concluded, "In the present case, the sale of liquor was made in a municipal territory clearly within the jurisdiction of the state, and outside the jurisdiction of the United States." *Dick*, 141 Fed. at 8. Thus, *Boss*'s dismissal of the indictment for lack of federal jurisdiction and its reliance on *Dick* implicitly acknowledged that the unallotted lands of the Uintah Reservation had been restored to the public domain and were therefore subject to the state's exclusive jurisdiction. *See also United States v. Fitzgerald*, 201 Fed. 295, 296 (8th Cir.1912) (referring to "the former Uintah Indian Reservation").

In sum, Congress, the President, executive department agencies, including the Department of Justice, the Department of the Interior, the Bureau of Indian Affairs, and the Forest Service, the courts, and the Ute Tribe itself have acted on the premise that the restoration language in the 1902 Act restored the unallotted, surplus land in the Uintah–Ouray Indian Reservation to the public domain when the Reservation was

finally opened in 1905 and diminished the Reservation as to that land.

## III. CONCLUSION

The 1902, 1903, 1904, and 1905 Acts, carefully analyzed, require the conclusion that the restoration language in the 1902 Act continued in operative effect as part of the scheme for opening the Reservation and that the 1905 Act simply amended and supplemented the 1902 Act. The 1905 Act did not restate the proposition that the unallotted, unreserved lands were restored to the public domain. Nor did it restate several other legal principles established in the 1902 Act that also governed the opening of the Reservation. As an act that amended and supplemented the 1902 Act, there was no need for the 1905 Act to restate that which was already established. Simply stated, the 1905 Act did not stand alone in opening the Reservation; it only extended the time for opening the Reservation under the 1902 Act and provided for the manner of the opening. The fact that the 1905 Act allowed settlement on the opened lands only under the homestead and town-site acts for a period of five years does not compel a different conclusion, nor does the fact that the Uintah and White River Utes were not paid a sum certain for the opened lands. Because the restoration language in the 1902 Act was never repealed, it remained in effect, and the Reservation was diminished. This case cannot therefore be disposed of under the rulings in *Rosebud, Mattz,* and *Seymour* that surplus land acts that simply "open" reservation lands to entry by non-Indians do not diminish the reservation.

In conclusion, we hold that the unallotted, unreserved lands of the Uintah Reservation were restored to the public domain by the 1902 Act, as amended by the 1903, 1904, and 1905 Acts, and that the Reservation boundaries were diminished by that restoration. The Reservation boundaries were further diminished by the withdrawal for the Strawberry River reclamation project and later enlarged by the 1945 Order of Restoration and the 1948 Hill Creek Extension.[28] Since Myton, Utah, lies outside the boundaries of the Reservation so described, it is not within Indian country. Therefore, the district court had subject matter jurisdiction over the burglary and the prosecution of Clinton Perank.

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

ZIMMERMAN, Justice: (dissenting).

I dissent. I cannot join the majority in interpreting a federal statute that affects the boundaries of the Uintah–Ouray Indian Reservation in a way which contradicts the construction approved by a majority of the entire United States Court of Appeals for the Tenth Circuit. I find almost incredible

---

**28.** We do not address the issue of whether the 1905 addition to the Uintah National Forest diminished the Reservation. The Tenth Circuit *en banc* decision in *Ute Indian Tribe* held that it was not thereby diminished, 773 F.2d at 1089–90; *id.* at 1099–1101 (Seymour, J., concurring), whereas that court's panel decision and the decision of the United States District Court for the District of Utah held otherwise. 716 F.2d at 1313–14; 521 F.Supp. at 1136–37. It is significant to note that the 1905 Act, which granted the President the authority to reserve unallotted lands in the Reservation as an addition to the Uintah Forest Reserve, specifically provided that such lands would be "subject to the laws, rules, and regulations governing forest reserves...." 33 Stat. 1070. The full text of the statute is set out at n. 20 *supra*. It was pursuant to this statutory authority that President Roosevelt withdrew 1,010,000 acres from the Uintah Reservation for the national forest by

the Proclamation of July 14, 1905, 34 Stat. 3116. The administrative authority over these lands was transferred from the Secretary of the Interior and the Bureau of Indian Affairs to the Secretary of Agriculture pursuant to the Act of February 1, 1905, ch. 288, 33 Stat. 628, and subjected to the jurisdiction of the Forest Service. In his dissenting opinion in *Ute Indian Tribe*, 773 F.2d at 1115, Judge Seth stated that Congress clearly evidenced an intent to remove the lands from the Reservation by the transfer of reservation status and administrative authority. *See also United States v. Gemmill,* 535 F.2d 1145, 1149 (9th Cir.1976) (continuous use of forest land for conservation and recreation strongly suggests extinguishment of Indians' title). The Utes were paid $1,217,000 in compensation for the forest reserve lands. *See Uintah and White River Bands of Ute Indians v. United States,* 139 Ct.Cl. 1, 7, 27–29 (1957).

the refusal of the majority of this court to accord comity to a federal court's decision in an area in which the federal government has preeminent authority and a unique trust responsibility. A majority of this court has given the State of Utah what it has desperately sought for six years—a second shot at persuading the United States Supreme Court to reject the Tenth Circuit's ruling and to give Utah control over a large part of the original reservation. This litigation certainly will not end here, now that there is a square conflict between the entire Tenth Circuit and this court. But this tactical victory for the State comes at an unacceptably high cost to the relationship between the state and federal judiciaries. Moreover, on the merits, I think the majority reaches the wrong result.

This case arises in the context of Clinton Perank's appeal challenging Utah's assertion of criminal jurisdiction over him. The State has taken advantage of Perank's appeal from a relatively minor criminal conviction to relitigate the question of the Uintah–Ouray Indian Reservation boundaries. In a separate federal proceeding seven years ago, the Tenth Circuit decided these boundaries against the State. *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir.1985) (en banc), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). Now, the State seeks to reopen the boundary issue in a new forum.

I would object to the State's opportunistic misuse of Perank's petty criminal prosecution to readjudicate a settled issue under any circumstance, but the unequal and inadequate briefing of the boundary issue in this case makes it a particularly poor vehicle for bringing us into a direct confrontation with the Tenth Circuit. Perank's brief contained a total of six pages of argument, the bulk of it concerning his assertion that he is an Indian. He allotted fewer than two pages to jurisdictional and boundary issues. In contrast, the State filed a fifty-page brief, devoting the majority of it to an attack on the Tenth Circuit's decision in *Ute Indian Tribe* and to a reargument of the boundary issue. In addition to the disparate treatment of the boundary issue by the immediate parties, Uintah and Duchesne Counties, which were also parties to the Tenth Circuit action, lodged a seventeen-page amicus brief supporting the State's position. Recognizing the one-sidedness of the proceeding, the State's counsel acknowledged at oral argument that perhaps the State's real adversary in this case—the Tenth Circuit—was absent.

We made an attempt to cure the one-sidedness of the briefing by soliciting participation by other parties with interests in this case. Unfortunately, we met with little success. At our invitation, the Ute Indian Tribe filed an amicus brief. However, apparently believing that we would not consider overturning the result of the Tenth Circuit's en banc decision, the Tribe, rather than addressing the impact of the Tenth Circuit's decision on our consideration of the issue or the merits of the boundary dispute, argued only that Perank was not a member of the Tribe and was therefore not in a position to challenge the state court's jurisdiction over him.

The week before argument, we contacted the State and encouraged it to inform the United States Attorney of the upcoming argument and to inquire whether the Justice Department wished to present its position before this court. The Justice Department did not appear at argument. We then invited the Justice Department to brief its position as an amicus. However, the Justice Department, demonstrating a surprising lack of interest in the case, refused to brief the matter and submitted only the brief it had filed years earlier in opposition to the State's petition for a writ of certiorari to the Tenth Circuit in *Ute Indian Tribe*. Thus, the State's arguments on the boundary question were virtually unchallenged.

Notwithstanding the lack of a true adversary proceeding on the boundary issue, the majority eagerly proceeds to the merits of the boundary dispute and takes a position contrary to that of a majority of the entire Tenth Circuit. I would find a direct confrontation with the Tenth Circuit on an essentially federal issue something to be

avoided under any circumstances, but this court's rush to adjudicate the issue is especially egregious given the importance of this question and the fact that the interests of all parties affected in the proceeding are not fairly before this court.

The reason I would not reach the merits of the boundary issue can be summed up in one word: comity. Under the doctrine of comity, courts of one jurisdiction will give effect to the laws and judicial decisions of another out of deference and mutual respect. *See, e.g., Pan Energy v. Martin,* 813 P.2d 1142, 1146 (Utah 1991); *Tracy v. Superior Court,* 168 Ariz. 23, 810 P.2d 1030, 1041 (1991); *Perrenoud v. Perrenoud,* 206 Kan. 559, 480 P.2d 749, 760 (1971); *In re Custody of Sengstock,* 165 Wis.2d 86, 477 N.W.2d 310, 314 (Wis.Ct. App.1991). *See generally* 21 C.J.S. *Courts* § 210 (1990). The scope and applicability of the comity doctrine are committed to the sound discretion of each court. *See, e.g., Pan Energy,* 813 P.2d at 1146; *State ex rel. Speer v. Haynes,* 392 So.2d 1183, 1185 (Ala.Civ.Ct.App.1979), *rev'd on other grounds sub nom. Ex Parte Haynes,* 392 So.2d 1187 (Ala.1980); *Tracy,* 810 P.2d at 1041; *Philadelphia v. Austin,* 86 N.J. 55, 429 A.2d 568, 572 (1981); *Sheridan v. Sheridan,* 65 Wis.2d 504, 223 N.W.2d 557, 560 (Wis.1974). The instant case presents compelling reasons to follow the rules of comity and defer to the Tenth Circuit's resolution of the boundary issue.

As a general proposition, we should defer to decisions of coordinate courts that have resolved the precise issue we face, unless doing so would contravene the laws or policy of this state. *See, e.g., Philadelphia,* 429 A.2d at 572; *In re Custody of Sengstock,* 477 N.W.2d at 314. Although

we have an interest in determining the scope of our own jurisdiction, I know of no existing state law or policy that would preclude us from deferring to the Tenth Circuit's determination of the boundaries of the Uintah–Ouray Indian Reservation.[1] For example, if we were to defer to the Tenth Circuit's decision, the result would not leave a jurisdictional void resulting in wrongs to this state or its citizens that would go uncompensated or unpunished. The Ute Indian Law and Order Code provides the courts of the Ute Indian Tribe with jurisdiction over civil and criminal matters occurring on the reservation and recognizes the jurisdiction of other forums where the Tribe does not have jurisdiction. *See* The Law and Order Code of the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah § 1-2-5. And we have spoken before of the need to recognize Indian tribes as sovereigns that are entitled to a presumption of legitimacy insofar as the exercise of their judicial power is concerned. *See In re Adoption of Halloway,* 732 P.2d 962, 968 (Utah 1986); *cf. Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 48–49, 109 S.Ct. 1597, ——, 104 L.Ed.2d 29 (1989) (approving *Halloway*).

But even if there were some presumption that we should reexamine a federal court determination of the jurisdiction of Utah courts—a proposition neither the State nor the majority advances—the circumstances of this case are more than sufficient to show that such a redetermination is inappropriate. First, comity concerns are heightened here where we are asked to revisit issues of federal law, decided on defensible bases by coordinate federal courts,[2] for the sole purpose of creating a

1. In footnote two of the court's opinion, the majority states that the Justice Department "failed to recognize that the Tenth Circuit's *en banc* decision in *Ute Indian Tribe* was in conflict with prior decisions of this [c]ourt." The majority then cites *Sowards v. Meagher,* 37 Utah 212, 108 P. 1112 (1910), and *White Rocks Irrigation Co. v. Mooseman,* 45 Utah 79, 141 P. 459 (1914). Yet as the majority itself recognizes, "it cannot be said, as a technical matter, that the *Sowards* opinion specifically addressed the question of whether the Reservation was disestablished as to the lands that were returned to the public

domain." The same observation holds true for *White Rocks Irrigation Co.* Consequently, the implication of the majority opinion in footnote two—that this court has previously ruled on the issue at bar and that the majority opinion is, in part, following established precedent—is simply incorrect.

2. *See, e.g., Hall v. Nomura Securities Int'l,* 219 Cal.App.3d 43, 268 Cal.Rptr. 45, 49 (Ct.App.), *reh'g denied* (June 20, 1990); *Bouwman v. Department of Social Servs.,* 144 Mich.App. 744,

conflict with the federal courts to force Supreme Court review. "Comity between federal and state courts is necessary to prevent scandal from unseemly conflicts of jurisdiction and to promote a decent and orderly administration of justice." 21 C.J.S. *Courts* § 210 (1990). Instead of seeking to further the interests of comity—prevention of a direct jurisdictional clash and promotion of the uniform administration of justice—the majority's decision to reach and redecide the merits of the boundary question needlessly upsets a previously settled area of law and achieves the opposite effect. Today's decision encourages litigants to forum shop in the hope of inconsistent decisions, an ill comity seeks to avoid in the federal-state context.[3] *See Dewey v. R.J. Reynolds Tobacco Co.*, 121 N.J. 69, 577 A.2d 1239, 1244 (1990).

An additional reason for applying principles of comity is to recognize the unique role of federal law in regulating Indian lands and interests. Because of this unique role, "federal courts are the ultimate decision maker as to whether federal, state or tribal courts have jurisdiction in a particular Indian law case." *State v. Daly*, 454 N.W.2d 342, 344 (S.D.1990). The primacy of federal authority in this area stems from at least three sources: the Constitution, the federal statute that admitted

Utah to the Union, and the special relationship assumed by the federal government toward Indian tribes.

The Constitution makes the federal government supreme in dealings with Indian tribes. *See Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832). Section 8 of Article I gives the federal government power "[t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian tribes." [4] U.S. Const. art. I, § 8, cl. 3. This provision implicitly recognizes that Indian tribes are quasi-sovereign entities with *sui generis* status as "domestic dependent nations" under federal law. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16–17, 8 L.Ed. 25 (1831). As an aspect of their inherent sovereignty, tribes exercise powers of self-government. *United States v. Wheeler*, 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1085–1086, 55 L.Ed.2d 303 (1978). In line with this grant of authority to the national government, state interference in the government-to-government relationship existing between the United States and Indian tribes is generally prohibited except to the extent that Congress has granted the state such authority. *See Worcester*, 31 U.S. (6 Pet.) at 561–62; Felix S. Cohen, *Handbook of Federal Indian Law* 259 (1982) [hereinafter Cohen].[5] This " 'policy of leaving In-

375 N.W.2d 806, 808 (1985); *Dewey v. R.J. Reynolds Tobacco Co.*, 121 N.J. 69, 577 A.2d 1239, 1244 (1990); *Van De Hey v. United States Nat'l Bank of Oregon*, 102 Or.App. 203, 793 P.2d 1388, 1390 (1990), *aff'd*, 313 Or. 86, 829 P.2d 695 (1992); *State v. Goodell*, 84 Or.App. 398, 734 P.2d 10, 11–12, *rev. denied*, 303 Or. 455, 737 P.2d 1248 (1987). *See generally* Note, *Authority in State Courts of Lower Federal Court Decisions on National Law*, 48 Colum.L.Rev. 943 (1948); Annotation, *Duty of State Courts to Follow Decisions of Federal Courts, Other Than the Supreme Court, on Federal Questions*, 147 A.L.R. 857 (1943).

**3.** The application of comity principles in the federal-state context is not new to this state. On at least one occasion of which I am aware, this court has recognized the appropriateness of deferring to federal court interpretations of federal law. *See Kuchenmeister v. Los Angeles & S.L.R.R.*, 52 Utah 116, 122, 172 P. 725, 727 (1918); *cf. Antillon v. Department of Employment Sec.*, 688 P.2d 455, 457 (Utah 1984) (holding that state court must follow federal court decision construing analogous statute from an-

other state where statutes were enacted as condition of continued federal approval of state unemployment compensation programs).

**4.** The Treaty Clause, U.S. Const. art. II, § 2, and the Supremacy Clause, *id.* art. VI, cl. 2, are also often cited as sources of exclusive federal power in dealing with Indian tribes. *See* Felix S. Cohen, *Handbook of Federal Indian Law* 207–12 (1982).

**5.** I recognize that the United States Supreme Court's "more recent cases have recognized the rights of states, absent a congressional prohibition, to exercise criminal (and, implicitly, civil) jurisdiction over non-Indians located on reservation lands...." *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, — U.S. —, —, 112 S.Ct. 683, —, 116 L.Ed.2d 687, 697 (1992). However, absent congressional authorization, such state jurisdiction is clearly prohibited to the extent that it " 'would interfere with reservation self-government or impair a right granted or reserved [to the tribe] by federal law.' " *Id.* (quoting *Orga-*

dians free from state jurisdiction and control is deeply rooted in the Nation's history.'" *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973) (quoting *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945)). Recognition of this policy was a condition of Utah's admission to the Union. The Enabling Act states:

> [T]he people inhabiting said proposed State do agree that they forever disclaim all right and title ... to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States....

Enabling Act, Act of July 16, 1894, ch. 138, § 3, 28 Stat. 107. I recognize that we have concurrent authority with federal courts to construe federal statutes. However, the constitutional commitment of authority over Indian tribes to the federal government requires that we proceed with special care in cases affecting the tribes. And when a federal court has spoken directly on an issue of Indian law, this care should be transformed to an extreme reluctance to redecide the matter.

The federal government's trust responsibility to Indian tribes also bears on the question of whether we should honor comity principles in this case. Ever since Chief Justice Marshall described the relationship of the tribes to the United States as "that of a ward to his guardian," *Cherokee Nation,* 30 U.S. (5 Pet.) at 16, the trust relationship has been a cornerstone of federal Indian jurisprudence. Cohen at 221. Of similar importance is the well-recognized

federal policy of supporting tribal self-government and self-determination. *See National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 856, 105 S.Ct. 2447, 2453, 85 L.Ed.2d 818 (1985); Cohen at 349. The federal government's trust responsibility to the tribes and the federal policy supporting tribal self-government and self-determination provide a backdrop against which federal courts resolve Indian issues. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). And it is this perspective that underlies the rule that courts are to interpret statutory provisions affecting Indians in favor of the tribes. *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 587, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977); *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); *Ute Indian Tribe,* 773 F.2d at 1089.[6]

Based on the foregoing considerations, I conclude that comity principles require deference to the Tenth Circuit's disposition of the boundary issue.

Following the course I suggest would not be novel. Several state courts have relied on comity principles in deferring to federal court decisions on Indian law questions. *See, e.g., Daly,* 454 N.W.2d at 344; *State v. St. Francis,* 151 Vt. 384, 563 A.2d 249, 253 (1989). Indeed, the South Dakota Supreme Court has gone so far as to overrule one of its cases in recognition of a federal court of appeals' ruling concerning South Dakota's jurisdiction over Indians living within the state. *State v. Spotted Horse,* 462 N.W.2d 463, 467 (S.D.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). Similarly, the Oregon Court of Appeals has overruled one of its prior decisions in order to defer to a federal court of appeals' ruling regarding a

---

*nized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 570, 7 L.Ed.2d 573 (1962)).

**6.** *See also National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 856, 105 S.Ct. 2447, 2453, 85 L.Ed.2d 818 (1985) (holding that policy of supporting tribal self-government and self-determination favors rule that provides tribal courts the first opportunity to evaluate factual and legal bases for jurisdictional chal-

lenges); *Nance v. Environmental Protection Agency,* 645 F.2d 701, 710–11 (9th Cir.) (noting that *"any* Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes" (emphasis in original)), *cert. denied sub nom. Crow Tribe of Indians v. Environmental Protection Agency,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).

tribe's treaty right to fish. *State v. Goodell*, 84 Or.App. 398, 734 P.2d 10, 11–12, *rev. denied*, 303 Or. 455, 737 P.2d 1248 (1987). Although these two courts did not expressly rely on comity principles in their holdings, I see no other obvious bases for the results they reached.

In short, there is well-established precedent for following comity principles in cases such as this.

As a final matter, I register my objection to the majority's treatment of the merits of the boundary issue. Were I to reach the issue, I would follow the exhaustive and thoroughly researched opinions of the federal courts, both trial and appellate. *See Ute Indian Tribe*, 773 F.2d 1087; *Utah Indian Tribe v. State of Utah*, 521 F.Supp. 1072 (D.Utah 1981). They constitute an adequate remonstrance to the majority's disposition of the issue. Specifically, those decisions followed the approach dictated by the Supreme Court in determining whether the various enactments at issue demonstrated a congressional intent to diminish reservation boundaries. That Court has said that, in the absence of *"substantial and compelling evidence* of a congressional intention to diminish Indian lands," the courts' "traditional solicitude for the Indian tribes" must compel a finding that "the old reservation boundaries survived the opening." *Solem v. Bartlett*, 465 U.S. 463, 472, 104 S.Ct. 1161, 1167, 79 L.Ed.2d 443 (1984) (emphasis added) (quoted in *Ute Indian Tribe*, 773 F.2d at 1089); *accord Rosebud*, 430 U.S. at 586, 97 S.Ct. at 1363 ("Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." (Citation omitted)). The Tenth Circuit and the district court viewed the relevant statutes with this perspective, *see* 773 F.2d at 1089; 521 F.Supp. at 1110 n. 118; a close reading of the majority decision here demonstrates that it does not.

There are times when I, as a state court judge, lament what might be fairly characterized as the second-guessing of our decisions by federal courts simply because they do not like a result we may have reached.

*See, e.g., Lafferty v. Cook*, 949 F.2d 1546 (10th Cir.1991) (disagreeing with *State v. Lafferty*, 749 P.2d 1239 (Utah 1988)) *cert. denied sub nom. Cook v. Lafferty*, —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992). The present case puts that shoe on the other foot, an exercise that may be ironic, but is even less defensible. The federal government is, after all, supreme on questions that fall within its purview. In this situation, federal statutory law is at issue, the federal trust responsibility to the Indian tribe is at issue, and it was the federal courts that adjudicated the boundary question years ago. As of today, federal supremacy and Supreme Court review of this court's decision provides the only remaining hope for the Ute Tribe, one of those "weak and defenseless people who are the wards of the nation, [and who are] dependent upon its protection and good faith," *Rosebud*, 430 U.S. at 586, 97 S.Ct. at 1363, for what little is left of the patrimony they held before the whites came to this continent.